FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 15, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RUSSELL OKERT, | No. 1:23-CV-03037-MKD |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING DAUBERT MOTION AS MOOT, AND DISMISSING CASE |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | **ECF Nos. 39, 53** |

Before the Court are Defendant's Motion for Summary Judgment, ECF No. 53, and Motion to Exclude Witness Testimony, ECF No. 39. On July 31, 2025, the Court held a motion hearing. ECF No. 86. Mark O'Halloran appeared on behalf of Plaintiff Russell Okert. John Drake appeared on behalf of Defendant United States.

The Court has reviewed the briefing and the record, has heard from counsel, and is fully informed. For the reasons set forth below, the Court grants summary judgment for Defendant on the issues of recreational use immunity and the Federal Tort Claims Act's (FTCA) discretionary function exception. As this case falls

ORDER - 1

outside the scope of the FTCA's waiver of sovereign immunity and outside the

Court's subject matter jurisdiction, the Court denies Defendant's Motion to

Exclude Witness Testimony as moot and dismisses the case.

## BACKGROUND

**A. Factual History**

On October 4, 2020, Plaintiff joined a sightseeing motorcycle ride organized

by a motorcyclists' group, the Covington Shifters. ECF No. 1 at 2 ¶ 5 (date of

incident); ECF No. 83 at 9 ¶¶ 20-21. Plaintiff was not licensed to operate a

motorcycle at that time. ECF No. 83 at 7-8 ¶ 17, 8-9 ¶ 19, 20 ¶ 43. He was riding

a type of motorcycle he understood to be a "city bike," which he had purchased

two months earlier from a friend. *Id.* at 6 ¶¶ 12-13. He had only received informal

instruction from family and friends about riding that motorcycle during the two

months he had owned it before joining the group ride. *Id.* at 6 ¶ 14, 7 ¶ 16.

The group took Forest Service Road (FSR) 7320 for part of the group ride.

*See id.* at 1-2 ¶ 1-2, 16 ¶ 38. FSR 7320 is also known as Old Blewett Highway, in

recognition of its history as the only road crossing Blewett Pass until the

construction of State Route 97, which bypassed FSR 7320. *Id.* at 2 ¶ 2. FSR 7320

lies in the Okanogan-Wenatchee National Forest. *Id.* The section north of Blewett

Pass is in Chelan County, and the section south of Blewett Pass is in Kittitas

ORDER - 2

County.  *Id.* at 2 ¶3.  The U.S. Forest Service maintains the section of FSR 7320 in Kittitas County.  *Id.*

The Forest Service's Guidelines for Road Maintenance Levels ("Guidelines") set five different maintenance standards for roads under the Forest Service's jurisdiction, from Level 1 (lowest standard of maintenance, closed to motor vehicles) to Level 5 (maintained for a high degree of user comfort and convenience).  *Id.* at 26-27 ¶¶ 52-54.  FSR 7320 is classified as a Level 3 road.  *Id.* at 27-28 ¶ 55.  FSR 7320 was confirmed as a Level 3 road in July 2007 during an Environmental Assessment performed by the Okanogan-Wenatchee National Forest, which considered recommendations from a previous road assessment and public comment on maintaining FSR 7320 at a Level 3.  *Id.* at 28 ¶ 56.

According to the Guidelines, Level 3 roads are maintained for travel "by a prudent driver in a standard passenger car" driving at low speeds.  *Id.* at 27-28 ¶ 55.  User comfort and convenience are not priorities for Level 3 roads.  *Id.*  The Guidelines note that Level 3 roads often have potholes or washboarding and typically have single lanes and turnouts.  *Id.*

On the stretch of FSR 7320 in Kittitas County, Plaintiff hit a pothole in the roadway, crashed, and was ejected from the motorcycle.  *Id.* at 2 ¶ 3, 16-17 ¶¶ 38-40.

ORDER - 3

**B. Procedural History**

Plaintiff filed suit on March 13, 2023, raising a single negligence claim.[1] ECF No. 1. Plaintiff alleged Defendant had breached its duty of care to him "when its employees, agents, and ostensible agents violated the standard of care – namely failing to maintain Old Blewett Highway in a manner which was safe for travelers, including [Plaintiff]." *Id.* at 3 ¶ 16.

In April 2024, Defendant moved to dismiss this case for lack of subject matter jurisdiction, bringing a factual challenge to the Court's subject matter jurisdiction under the FTCA based on Washington's recreational use immunity statute. ECF No. 27. The Court denied the motion, with leave for Defendant to renew the recreational use immunity arguments in a motion for summary judgment after the close of discovery. ECF No. 43.

Discovery closed on December 16, 2024. *See* ECF No. 52 at 16. Defendant moved for summary judgment. ECF No. 53. Briefing on the summary judgment motion was interrupted by the withdrawal of original counsel for Plaintiff and Ms. Okert. *See* ECF Nos. 60, 63, 67. The Court struck all case deadlines and stayed the proceedings to permit Plaintiff and Ms. Okert to find new counsel or decide to

---

[1] Plaintiff Shaina Okert was dismissed pursuant to the parties' stipulation. ECF Nos. 71, 74.

ORDER - 4

proceed in pro se.  ECF No. 67.  Plaintiff subsequently found new counsel, and the parties stipulated to dismiss Ms. Okert from the matter.  *See* ECF Nos. 70, 71.  On April 11, 2025, the Court lifted the stay.  ECF No. 73.  The Court reset the briefing deadlines for the pending motions in accordance with the parties' joint request, to allow Plaintiff's new counsel time to familiarize himself with the case.  *See* ECF No. 70 at 2; ECF No. 73.

Plaintiff filed his initial Response by the applicable deadline, ECF No. 75, then filed an Amended Response several days later to correct formatting noncompliance with the Local Civil Rules (LCivR), ECF No. 79.  *See* Docket Entry for ECF No. 79 ("Description: compliance with font and spacing.").

## LEGAL STANDARD

### A. Summary Judgment

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes*

1  *Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty*

2  *Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

3      The moving party bears the initial burden of "informing the district court of

4  the basis for its motion, and identifying those portions" of the record and the

5  evidence that "demonstrate the absence of a genuine dispute of material fact."

6  *Celotex*, 477 U.S. at 323 (quoting former Fed. R. Civ. P. 56(c)) (quotation marks

7  omitted).  After the moving party has satisfied its burden, the non-moving party

8  must demonstrate, through evidence on the record, "specific facts" showing that

9  there is a genuine dispute of material fact for trial.  *Id.* at 324 (citation and

10 quotation marks omitted).  The court "must view the evidence in the light most

11 favorable to the nonmoving party and draw all reasonable inference in the

12 nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir.

13 2018) (citation omitted).  However, "[t]he mere existence of a scintilla of evidence

14 in support of the plaintiff's position will be insufficient; there must be evidence on

15 which the [fact finder] could reasonably find for the plaintiff."  *Anderson*, 477 U.S.

16 at 252.

17 **B. FTCA Jurisdiction**

18     "An action can be brought by a party against the United States only to the

19 extent that the Federal Government waives its sovereign immunity."  *Blackburn v.*

20 *United States*, 100 F.3d 1426, 1429 (9th Cir. 1996) (citing *Valdez v. United States*,

ORDER - 6

56 F.3d 1177, 1179 (9th Cir. 1995)).  "If sovereign immunity has not been waived, the court must dismiss the case for lack of subject matter jurisdiction." *Esquivel v. United States*, 21 F.4th 565, 572-73 (9th Cir. 2021) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).

The FTCA is a limited waiver of the United States' sovereign immunity. *Blackburn*, 100 F.3d at 1429; *see also Meyer*, 510 U.S. at 477.  FTCA jurisdiction applies to claims meeting the following six elements:

> [1] [brought] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Meyer*, 510 U.S. at 477 (quoting 28 U.S.C. § 1346(b)).  Under the sixth element, the inquiry is "whether a private person would be liable for [the plaintiff's] injuries" under applicable state law.  *Mattice ex rel. Mattice v. U.S., Dep't of Interior*, 969 F.2d 818, 820 (9th Cir. 1992) (citing *McMurray v. United States*, 918 F.2d 834, 836 (9th Cir. 1990)).

The FTCA also enumerates certain exceptions from its "broad waiver of immunity," including the discretionary function exception in 28 U.S.C. § 2680(a). *Esquivel*, 21 F.4th at 573 (quoting *United States v. S.A. Empresa de Viacao Aerea*

ORDER - 7

1  *Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)) (quotation marks

2  omitted).

3  **DISCUSSION**

4  Defendant seeks summary judgment on three issues: (1) the affirmative

5  defense based on state-law recreational use immunity and (2) the affirmative

6  defense based on the FTCA's discretionary function exception, and (3) damages

7  other than special damages for medical expenses.  ECF No. 53.

8  The first and second issues implicate both the merits of Plaintiff's claim and

9  the Court's subject matter jurisdiction over this case, which is based solely on the

10 FTCA.  *See* ECF No. 1 at 2 ¶ 3 (citing 28 U.S.C. § 1346(b)(1)).  Specifically,

11 summary judgment on the defense of recreational use immunity would indicate

12 that Defendant, if a private person, would not be liable for Plaintiff's injuries under

13 applicable state law, such that this case would fail to meet the sixth element for

14 FTCA jurisdiction.  *See Mattice*, 969 F.2d at 820.  Granting summary judgment on

15 the defense of the discretionary function exception would similarly place this case

16 outside of the FTCA's waiver of sovereign immunity.  *See Esquivel*, 21 F.4th at

17 573.  The Court begins by addressing the two jurisdictional issues, the results of

18 which ultimately moot the damages issue.

19

20

ORDER - 8

**A. Recreational Use Immunity**

*1. Applicability of RCW 4.24.210 Immunity*

"Recreational use immunity is an affirmative defense, so the landowner bears the burden of proving entitlement to that immunity." *Schwartz v. King Cnty.*, 516 P.3d 360, 364 (Wash. 2022) (citing *Camicia v. Howard S. Wright Const. Co.*, 317 P.3d 987, 991 (Wash. 2014)). Pursuant to RCW 4.24.210(1), a public or private landowner who opens their land to the public "for the purposes of outdoor recreation . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users."

It is undisputed that the Forest Service opened FSR 7320 to the public, at least in part for recreational purposes, without charging a fee. ECF No. 83 at 24-25 ¶¶ 50-51, 38 ¶ 67. Plaintiff's only dispute concerns a question of law: he contends that RCW 4.24.210 "does not apply to land primarily used for transportation or utility purposes." ECF No. 79 at 5. However, Plaintiff's interpretation of RCW 4.24.210 is not supported by the case law he cites.[2] In

---

[2] There are instances where Plaintiff inaccurately represents the holdings of his cited cases. For example, Plaintiff asserts that *Van Dinter v. City of Kennewick*, 846 P.2d 522 (Wash. 1993) "demonstrate[es] that Washington courts apply RCW 4.24.210 with careful scrutiny in the context of roads and transportation routes."

ORDER - 9

support, he quotes a section from *Camicia* in which the Washington Supreme Court noted that a broad reading of RCW 4.24.210 might "unjustly relieve the government of its common-law duty to maintain roadways in a condition reasonably safe for ordinary travel." ECF No. 79 at 3-4, 4 nn. 6-7 (quoting 317 P.3d at 994); *see also id.* at 6 & n.11. However, the Washington Supreme Court has rejected Plaintiff's argument that *Camicia* requires exclusive or primary recreational use:

> In *Camicia*, a bicyclist sustained severe injuries while riding along the Interstate 90 (I-90) trail located in the city of Mercer Island. . . . The bicyclist brought a negligence suit against the city, which the trial court dismissed on

ECF No. 79 at 4 & n.7, 5 & n.10. The land at issue in *Van Dinter* was not a road or transportation route, but rather "a park in Kennewick" that contained "a caterpillar-shaped piece of playground equipment designed for children to climb on." *See* 846 P.2d at 523. Plaintiff also contends that the court in *Van Dinter* "held that [RCW 4.24.210] did not apply because the city had not opened the land for recreational use, emphasizing that to qualify for immunity, there must be a pervasive recreational purpose in its use." ECF No. 79 at 5 & n.10. The court in *Van Dinter* did not analyze whether the park had been opened for recreational purposes, apparently because that issue was not disputed. *See id.* at 525. Instead, the court focused on the dispute regarding the exception to RCW 4.24.210. *See id.*

ORDER - 10

summary judgment based on recreational immunity. On appeal, this court determined that summary judgment was improper because there were factual disputes as to ***whether the I-90 trail was open for recreation at all*** or solely for transportation purposes. . . . We remanded the case to the trial court. Our holding in *Camicia* is clear: where evidence conflicts regarding whether the land is open for recreational use, the case must go before a finder of fact. . . . ***The land in Camicia was used primarily for transportation. If sole recreational use was required, remand would have made no sense.***

*Lockner v. Pierce County*, 415 P.3d 246, 251 (Wash. 2018) (citations omitted) (emphases added). The court underscored that "immunity is not extinguished when land is used for other public or private activities in addition to recreation." *Id.* (citing RCW 4.24.210; *McCarver v. Manson Park & Rec. Dist.*, 597 P.2d 1362, 1364 (Wash. 1979); *Riksem v. City of Seattle*, 736 P.2d 275, 278-79 (Wash. Ct. App. 1987); *Widman v. Johnson*, 912 P.2d 1095, 1097-98 (Wash. Ct. App. 1996)).

Here, Defendant has submitted evidence that the Forest Service opened FSR 7320 to the public for recreational purposes, and Plaintiff does not dispute it. *See, e.g.*, ECF No. 54 at 7 ¶ 19; ECF No. 29-13 at 3; ECF No. 29-16 at 3. It is irrelevant as a matter of law whether the Forest Service also opened FSR 7320 for other public or private activities in addition to recreation.

Defendant has established that it is entitled to recreational use immunity under RCW 4.24.210 unless there is genuine issue for trial as to whether the statutory exception in RCW 4.24.210(4)(a) applies.

ORDER - 11

1          *2. Exception to Recreational Use Immunity*

2          RCW 4.24.210(4)(a) provides an exception to recreational use immunity,

3    wherein landowners may still be held liable "for injuries sustained to users by

4    reason of a known dangerous artificial latent condition for which warning signs

5    have not been conspicuously posted." "'All four terms (known, dangerous,

6    artificial, latent) modify "condition," not one another,' and so all must be present

7    for the exception to apply." *Schwartz*, 516 P.3d at 364 (alteration omitted)

8    (quoting *Jewels v. City of Bellingham*, 353 P.3d 204, 208 (Wash. 2015), *abrogated*

9    *on other grounds by Schwartz*, 516 P.3d at 366).  It is the plaintiff's burden to

10   establish all four elements.  *See Davis v. State*, 30 P.3d 460, 463 (Wash. 2001).  "If

11   one of the four elements is not present, a claim cannot survive summary

12   judgment." *Id.* at 462.

13         For purposes of summary judgment, the Washington courts generally adopt

14   the plaintiff's definition of the injury-causing condition, as part of the court's

15   obligation to draw all reasonable inferences in favor of the non-moving party.  *See,*

16   *e.g., Swinehart v. City of Spokane*, 187 P.3d 345, 350-51 (Wash. Ct. App. 2008);

17   *Davis*, 30 P.3d at 461-63; *Van Dinter*, 846 P.2d at 525.  Plaintiff alternatively

18   defines the relevant injury-causing condition as either the pothole he struck or,

19   FSR 7320 more broadly.  *Compare* ECF No. 79 at 2, 8, 11, 12, 14 ("washout-

20   pothole"), *with id.* at 12 ("[t]he road," "the creation of Old Blewett Highway").

ORDER - 12

Under either of Plaintiff's definitions, there is no basis by which a reasonable fact finder could conclude that the condition met all four requirements of the exception in RCW 4.24.210(4)(a). If the relevant condition is defined as the pothole, it was not artificial, or latent, or known. If the relevant condition is defined as FSR 7320 more broadly, it was not latent.

### a. The Pothole Was Not an "Artificial" Condition

"For purposes of RCW 4.24.210, the meaning of 'artificial' is the ordinary meaning[,]" i.e., "contrived through human art or effort and not by natural causes detached from human agency," "relating to human direction or effect in contrast to nature," "formed or established by man's efforts, not by nature." *Davis*, 30 P.3d at 462 (citation and quotation marks omitted). "The correct inquiry is not whether a condition was intentionally created; rather, the proper inquiry is whether the injury-causing condition was the product of human efforts in contrast to a naturally occurring condition." *Id.* at 462 n.2.

Plaintiff has not directed the Court to any evidence about the cause of the pothole, nor evidence that it was the product of human efforts. Plaintiff appears to assert that the pothole was caused by natural water erosion, often referring to it as a "washout-pothole" in his Response. *See Washout*, Merriam-Webster (updated Aug. 6, 2025), https://www.merriam-webster.com/dictionary/washout ("1 a: the washing out or away of something and especially of earth in a roadbed by a

ORDER - 13

freshet"); *Wash-out*, Oxford English Dictionary (updated June 2024),

https://www.oed.com/dictionary/wash-out_n ("3. The removal by flood of a

portion of a hillside; a hole or breach in a railway or road track caused by flood or

erosion.").

Regardless, it is Plaintiff's burden to create a genuine issue of fact that the

pothole was artificial, and he has not presented evidence from the record to carry

that burden. This is one of multiple independent reasons why Plaintiff's claim

cannot survive summary judgment on recreational use immunity. *See Davis*, 30

P.3d at 462.

> b. The Pothole Was Not a "Latent" Condition

To determine whether a condition is "latent," courts inquire "whether the

injury-causing condition is readily apparent to the general class of recreational

users" based on "the typical recreational user's perspective." *Schwartz*, 516 P.3d

at 366 (citations omitted). "This is an objective inquiry." *Jewels*, 353 P.3d at 209.

"[W]hat one 'particular user sees or does not see is immaterial.'" *Id.* (quoting

*Widman v. Johnson*, 912 P.2d 1095, 1098 (Wash. Ct. App. 1996)). "An obvious

defect, however, cannot be latent." *Chamberlain v. Dep't of Transp.*, 901 P.2d

344, 348 (Wash. Ct. App. 1995) (citation omitted). Moreover, "RCW 4.24.210

does not hold landowners potentially liable for patent conditions with latent

dangers. The condition itself must be latent." *Van Dinter*, 846 P.2d at 526.

ORDER - 14

1    Plaintiff contends that the latency of the pothole is demonstrated by the

2  testimony of "[e]ye-witnesses" and the conclusions of his engineering expert John

3  McNutt.  ECF No. 79 at 13-14.  Though referring to plural eyewitnesses, he only

4  cites testimony from a single person who attended the group ride, Serenity Oakes.

5  *Id.* at 13 n.30 (citing ECF No. 77-4 at 8, 13, 15-17).  Ms. Oakes was a passenger

6  riding on the back of her husband's motorcycle,[3] which she estimates was 15 to 25

7  feet behind Plaintiff's motorcycle when he struck the pothole.  ECF No. 83 at 59

8  ¶ 33; ECF No. 77-4 at 12.  Plaintiff provides no case law, and the Court can find

9  none, indicating that a vehicle *passenger's* personal failure to discover a roadway

10 condition is relevant to assessing whether the condition was latent.  *Cf. Ravenscroft*

11 *v. Wash. Water Power Co.*, 969 P.2d 75, 83 (Wash. 1998) (finding a genuine

12 dispute of fact on the latency of a stump submerged in a waterway where the ***driver***

13 of the plaintiff's boat testified that he did not see the stump, and where there was

14 evidence of other boats hitting the stumps).  Rather, latency is determined based on

15 the perspective of users engaged in similar, typical recreational activities.  *See*

16 *Schwartz*, 516 P.3d at 366 (rejecting a "standing near" test for latency, which

17 _____

18 [3] At the hearing, counsel for the United States confirmed, and Plaintiff's counsel

19 did not dispute, that Ms. Oakes was riding on the back of the motorcycle and was

20 not in a position comparable to that of a motorcycle driver.

ORDER - 15

would not account for the perspectives of other kinds of typical recreational users, such as bicyclists, skateboarders, skiers, runners, swimmers, etc.).  A motorcycle passenger does not have the same degree of obligation to pay attention to the roadway, nor the same field of vision, as a motorcycle driver.  *Cf. Swinehart*, 187 P.3d at 847-48 (finding that the plaintiff had not created a genuine issue of fact on the "latent" factor by "fail[ing] to pay adequate attention to his surroundings as he approached the end of [a] slide").

Under the properly defined "general class of recreational users," Plaintiff has not shown evidence from which a reasonable fact finder could conclude that the pothole was ***not*** readily apparent to those driving vehicles on FSR 7320 for recreational purposes.  *See Schwartz*, 516 P.3d at 365.  All evidence currently before the Court indicates that every motorcycle driver participating in the group ride saw the potholes well before reaching them.  To begin with, Plaintiff himself admits he "noted that there were several large potholes" on the roadway before his accident on one of those potholes.  ECF No. 83 at 17 ¶ 40 (citing ECF No. 29-1 at 3-4).  Ms. Oakes testified that no one else from the group had an accident because of the potholes, including "at least five, six people" in the group that had ridden so far ahead of Plaintiff that they were out of sight.  ECF No. 29-11 at 3-4, 8-9.  Charles Saylor and Mike Leone, who were also on motorcycles behind Plaintiff, similarly testified that there were several motorcycle riders ahead of Plaintiff who

ORDER - 16

1  did not crash because of the potholes.  ECF No. 29-9 at 11-12, 20-21; ECF No. 29-

2  12 at 4.  Mr. Saylor estimated that the motorcycles ahead of Plaintiff amounted to

3  about half of the entire group.  ECF No. 29-9 at 11.

4       Mr. Saylor testified to various facts indicating that he, Plaintiff, and the other

5  drivers in their vicinity had no difficulty seeing the potholes on FSR 7320 in

6  advance.  He stated that on the drive on FSR 7320, before the accident, they "were

7  keeping [their] speed down" due to turns in the road, an uneven road surface, and

8  potholes.  *Id.* at 7-8.  He testified that he saw "numerous" smaller potholes that did

9  not require him to "brake before" driving through them, and that the group and

10  Plaintiff had previously slowed down to navigate "a dozen" larger potholes.  *Id.* at

11  9, 18-19, 21-22.  He estimated that the potholes ranged in size "from maybe the

12  size of a basketball to the one that [Plaintiff] ended up crashing into, which was, I

13  don't know, I would say the size of a Volkswagen.  It's not quite that big, but very

14  large."  *Id.* at 8-9.  Mr. Saylor was also able to see the pothole Plaintiff struck from

15  a significant distance away: he testified that he was around "100 feet, couple

16  hundred feet maybe," behind Plaintiff at the time of the accident, with two

17  motorcycles in between them, when he saw Plaintiff's motorcycle "drop[] into the

18  pothole."[4]  *Id.* at 12-14, 17-19.

19  ―――――――――――――

20  [4] Plaintiff points to the following testimony from Mr. Saylor:

ORDER - 17

Mr. Leone testified that there were "potholes four to six inches deep" and "sand, gravel across the top of [the] pavement" that he was able to see once he "got into that stretch of road." ECF No. 77-3 at 7-8. When asked how many potholes he saw in that area, he answered, "There was enough on the road, it didn't matter if you went right or left. There were enough of them to make it a severe obstacle. The entire roadway was filled with them." *Id.* at 8. Though not entirely clear from the excerpts in the record, it appears Mr. Leone was driving a motorcycle far enough behind Plaintiff that he did not see Plaintiff's accident, as he testified that Plaintiff was already "piled up on the road" when he got to the scene. *Id.* at 6.

---

> Q. Let me ask you this and I'll preface it by saying I recognize that it calls for a healthy degree of speculation, but if the positions had been reversed and you had been the first rider coming around that curve and down the hill, do you think you would've hit that pothole?
> MS. IBRAHIM: Object.
> A. I have actually thought about that quite a number of times. And I think that, I think that it would've been a crapshoot. I don't know for sure that I could've missed it. I would like to think that yes, I could have.

ECF No. 32-5 at 8. As the question acknowledged, this is plain speculation. Regardless, this does not contradict Mr. Saylor's testimony that he was able to see the pothole from 100-plus feet away.

ORDER - 18

1    Anthony Moore, who was driving the motorcycle at the back of the group,

2  submitted a declaration stating that the pothole Plaintiff struck was "quite large"

3  and "easy for someone driving a motorcycle to see, assuming they were paying

4  attention." ECF No. 28 at 2 ¶ 3, 4-5 ¶ 10. He stated the pothole "was not covered,

5  obstructed, or otherwise concealed."[5] *Id.* at 4-5 ¶ 10. This is consistent with the

6  photos Mr. Saylor took of the pothole shortly after Plaintiff's accident. *See* ECF

7  No. 83 at 18-20 ¶ 42 (larger versions of these photos are filed at ECF No. 29-10).

8  The photos show potholes that appear, under the lighting conditions that existed

9  that day, as obvious darkened spots in the lighter asphalt roadway. ECF No. 29-10

10  at 2. There is a thin deposit of orange pine needles just below the drop-off edge of

11  the pothole Plaintiff struck, providing an additional visual contrast. *Id.* at 2, 4.

12    Finally, Plaintiff quotes the following section from Mr. McNutt's report, in

13  support of his arguments on latency:

14        Mr. Okert encountered the "large pothole" after
       negotiating a horizontal curve to the left. ***At 20 miles per***

15

16

17  ———————————

18  [5] Although Plaintiff contends that "the sun and the downgrade made it difficult to

19  see the pothole," he again cites only to Ms. Oakes' deposition testimony in support

20  of that contention. ECF No. 83 at 56 ¶ 24 (citing ECF No. 77-4 at 8).

ORDER - 19

*hour the distressed area of pavement*[6] *could have been evident approximately 203 feet (7 seconds) prior to impact.* Even at 72 feet (2.5 seconds) prior to impact, the severity of the pothole may not be evident. Two and a half seconds is the amount of time used to account for a driver's perception of a problem and react to it. Additional time beyond that two and a half seconds is necessary for braking and avoidance.

ECF No. 79 at 13-14 (quoting ECF No. 77-9 at 11) (emphasis added). Mr. McNutt therefore agrees that the potholes in the roadway were visible well in advance to a driver on FSR 7320, and that it was only the severity of the danger posed by the pothole that *may* not have become apparent in time for a driver to react. However, "injuries that result from latent dangers presented by a patent condition are not actionable under RCW 4.24.210." *Van Dinter*, 846 P.2d at 526.

A reasonable fact finder could not conclude that the pothole was latent based on the evidence currently before the Court. This is another, independent reason why Plaintiff's claim cannot survive summary judgment on recreational use immunity. *See Davis*, 30 P.3d at 462.

---

[6] At the time of Mr. McNutt's inspection, he observed that the pothole Plaintiff struck had been filled in. ECF No. 77-9 at 8.

ORDER - 20

1

c.  The Pothole Was Not a "Known" Condition

2      The "known" factor of the exception requires proof of "actual knowledge on

3   the part of the landowner." *Nauroth v. Spokane Cnty.*, 88 P.3d 996, 997 (Wash. Ct.

4   App. 2004) (citation omitted).   "Summary judgment is appropriate where a

5   plaintiff presents no evidence that the landowner had actual knowledge of the

6   condition giving rise to the plaintiff's injury." *Cultee v. City of Tacoma*, 977 P.2d

7   19, 22 (Wash. Ct. App. 1999) (citation omitted), *abrogated in other part by Jewels*,

8   353 P.3d 208 n.3.

9      Plaintiff has not met his burden to show a genuine issue for trial about

10  whether the Forest Service had actual knowledge of the pothole he struck.  He cites

11  the following evidence about the "known" factor:[7]

12  _____

13  [7] The Court rejects Plaintiff's argument that Defendant conceded this point by

14  failing to raise it in the Motion to Dismiss.  *See* ECF No. 79 at 8 & n.14 (citing

15  ECF No. 27 at 16).  The Court also rejects Plaintiff's suggestion that knowledge

16  can be inferred from the Forest Service's 2023 pothole repairs.  *See id.* at 10

17  ("USFS did nothing to this road until 31 months after Mr. Okert made known the

18  dangerous pothole . . . .");  ECF No. 83 at 64-65 ¶¶ 44-46.  Under Fed. R. 407,

19  subsequent remedial measures are "not admissible to establish what was

20  knowable" in October 2020 and therefore "cannot aid [Plaintiff] in avoiding

ORDER - 21

- the Forest Service's commitments regarding the maintenance of the section of FSR 7320 located in Chelan County, *see* ECF No. 79 at 8-9 (citing ECF No. 77-1), although it is undisputed that the section of FSR 7320 where Plaintiff hit the pothole is in Kittitas County;

- the Forest Service's general policies that roads be inspected and maintained for "safe and efficient travel" and "for their intended and anticipated uses," citing generally to 36 C.F.R. § 212.5 and the Forest Service's "Road Operations and Maintenance Policies (FSM 7730) and Road System Operations and Maintenance Handbook (FSH 7709.59),"[8] ECF No. 79 at 9-10;

- testimony from David Farmer, the Deputy Forest Supervisor for the Okanogan-Wenatchee National Forest, that maintenance is performed based on problems reported by employees in the field or members of

---

summary judgment. *See Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948-49 (9th Cir. 2012) (citations omitted).

[8] Plaintiff does not cite to specific parts of these lengthy policies, and the Court declines to sift through them on his behalf. *See* ECF Nos. 55-12, 55-13; LCivR 56(c)(1)(B), (e).

ORDER - 22

the public, not based on formal maintenance inspections, ECF No. 79 at 10 & n.20 (citing ECF No. 77-10 at 6);

- a record that appears to document Forest Service maintenance work, described as "Vegetation-Roadside removal-Maintenance level 3," performed on an unspecified 4-mile section of FSR 7320 on September 30, 2018,[9] ECF No. 79 at 10 & n.21 (citing ECF No. 77-14 without pincite, though Plaintiff is presumably referring to page 2);

- the lack of "other information" reflecting Forest Service repairs to the relevant area of FSR 7320 between 2018 and October 2020, ECF No. 79 at 10; and

───────────────────────

[9] By citing this maintenance record from two years before the accident, Plaintiff appears to argue that the pothole would have existed and been obvious to anyone in the vicinity at that time, so one could infer that these maintenance workers must have seen it. This inference relies upon several layers of speculation: that the pothole existed in 2018, appeared similarly to the way it looked in October 2020, and was in the vicinity of vegetation removal workers were performing work in the vicinity of the pothole Plaintiff struck.

ORDER - 23

- reporting from Mr. McNutt that he saw pothole repairs of varying ages during his inspection of FSR 7320 in June 2023, ECF No. 79 at 10-11, 11 n.22 (citing ECF No. 77-9 at 10), though Mr. McNutt provided no opinion or estimate about when these repairs occurred or how old the unfilled potholes were.

This evidence does not suffice to show a genuine dispute on the "knowledge" factor of the recreational use exception.

In his statement of facts, Plaintiff offers several excerpts of Forest Service employee testimony that show he is not genuinely disputing that Forest Service *lacked* actual knowledge of the pothole. For example, Plaintiff indicates, and Defendant does not materially dispute, that "Mr. Farmer is not aware of whether or not maintenance was needed in the location where the incident occurred." ECF No. 83 at 70 ¶ 57 (citing ECF No. 77-10 at 10). In this part of his deposition, Mr. Farmer testified as follows:

> Q.    Are you -- are you aware of whether or not this area of the road where Mr. Okert was in an accident had been identified as needing maintenance under the process that you described earlier?
> A.    I'm not aware.
> . . .
> Q.    Are you aware of whether or not maintenance was needed at that location?
> . . .
> A.    . . . I'm not aware of what is -- what was on the plan or not.

ORDER - 24

. . .
>Q.    Have you been involved in or privy to any conversations about maintaining that specific area?
>A.    I have not.

ECF No. 77-10 at 10.  Similarly, Plaintiff indicates, and Defendant does not dispute, that Amanda Warner-Thorpe, a Forest Service Regional Transportation Program Manager, had never been to FSR 7320 before, had not seen a road maintenance plan for FSR 7320, did not know if there was a road maintenance plan for FSR 7320 in the years before Plaintiff's accident, and was not aware of any written log of the potholes on FSR 7320 from before Plaintiff's accident.  ECF No. 83 at 71 ¶ 60, 73 ¶ 64, 74 ¶ 68 (citing ECF No. 77-11 at 4, 8, 10, 13).

>Q.    . . . Are you aware of whether there's any written record of the size and number of potholes that existed on the road in question prior to the incident?
>A:    No.
>Q.    Based on your experience, is that something that is generally recorded?
>. . .
>[A:]   Our roads have thousands of potholes so I think it would be impossible to record each and every pothole on a road.

ECF No. 77-11 at 10.

The evidence Plaintiff has presented, viewed in the light most favorable to him, could perhaps create a genuine dispute as to whether the Forest Service should have known about—but failed to discover—the pothole.  But it does not create a genuine issue for trial as to whether the Forest Service had actual

ORDER - 25

knowledge of the pothole before the accident.  Plaintiff has therefore not met his burden to survive summary judgment on recreational use immunity for a third, independent reason.  *See Davis*, 30 P.3d at 462.

### d.  FSR 7320 Was Not a "Latent" Condition

Plaintiff changes his definition of the relevant condition to FSR 7320 as a whole in his arguments about the "artificial" element. [10]  ECF No. 79 at 12 ("*Old Blewett Highway* is an artificial condition. . . . *The road* was constructed, paved, and previously patched.  Once the government manipulates natural terrain for vehicular travel, it creates an artificial condition subject to this exception." (emphases added)).  Even if the Court accepts this definition for the sake of argument, Plaintiff fails to produce evidence from which a reasonable fact finder could conclude that FSR 7320 was a latent condition.  There is no dispute that FSR 7320 was readily apparent to the general class of recreational users.

### 3. Conclusion

Defendant has shown there is no genuine dispute of material fact that the Forest Service opened FSR 7320 to the public for recreational use without

---

[10] Plaintiff made similar arguments in opposing the United States' motion to dismiss.  *See* ECF No. 31 at 20 ("[T]his court should find that the road created by Defendant was a man-made artificial condition.").

ORDER - 26

1   charging a fee, and no reasonable fact finder could conclude from the evidence in

2   the record that Plaintiff was injured by a condition that was simultaneously known,

3   dangerous, artificial, and latent.  Defendant is entitled to summary judgment on the

4   affirmative defense of recreational use immunity and dismissal of this case for lack

5   of subject matter jurisdiction.

6   **B. Discretionary Function Exception**

7        Defendant has also shown it is entitled to summary judgment on the FTCA's

8   discretionary function exception, which independently requires the Court to

9   dismiss the case for lack of subject matter jurisdiction.

10        28 U.S.C. § 2680(a), commonly known as the discretionary function

11   exception, excludes from the FTCA's waiver of sovereign immunity any claim

12   "based upon the exercise or performance or the failure to exercise or perform a

13   discretionary function or duty on the part of a federal agency or an employee of the

14   Government, whether or not the discretion involved be abused." *Chang v. United*

15   *States*, 139 F.4th 1087, 1092-93 (9th Cir. 2025) (quotation marks omitted).

16        "The Supreme Court has established a two-part test to determine whether the

17   discretionary function exception applies to a plaintiff's claim." *Id.* at 1093 (citing

18   *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)).  "First, [the court] must

19   consider whether the agency's allegedly negligent conduct is discretionary—that

20   is, whether the action is a matter of choice for the acting employee." *Id.* (quoting

ORDER - 27

*Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014)) (quotation marks omitted).  Second, the court "must determine whether the particular exercise of discretion was of the kind that the discretionary function exception was designed to shield."  *Id.* (quoting *Young*, 769 F.3d at 1053) (quotation marks omitted).  "Only governmental actions and decisions based on considerations of public policy involve the relevant exercise of discretion."  *Id.* (quoting *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)) (quotation marks and alteration omitted).  The Ninth Circuit has distinguished between governmental "design" decisions, which are "shielded under the discretionary function exception," and implementation decisions, which are not.  *Id.* at 1094 (quoting *Whisnant v. United States*, 400 F.3d 1177, 1181-82 (9th Cir. 2005)) (quotation marks omitted).

      *1.  Defining the Allegedly Negligent Act*

        a.  Unpleaded Failure-to-Warn Theory

     Plaintiff portrays the Forest Service's negligence as a matter of "operational negligence" or "negligent *implementation* of policy," namely, the alleged "failure to repair and warn of known hazards."  ECF No. 79 at 14-15 (emphasis in original).  As the Court observed at the hearing, the Complaint only states a failure-to-maintain theory of negligence liability:

    **V.    FIRST CAUSE OF ACTION – NEGLIGENCE**

     14.    This is a straightforward case of negligence.

ORDER - 28

15.     Defendant owed a duty of care to Plaintiff Russell Okert.

16.     Defendant breached that duty when its employees, agents, and ostensible agents violated the standard of care – namely *failing to maintain* Old Blewett Highway in a manner which was safe for travelers, including Russell Okert – as set forth herein and in other respects as well.

ECF No. 1 at 3. An earlier section of the Complaint mentions the lack of warning signs on FSR 7320, but even there, the Complaint underscores that the allegedly negligent act or omission was the Forest Service's failure to maintain FSR 7320:

6.     This tragic event could have been avoided had the U.S. Forest Service *properly maintained* the forest service road. There were no signs posted warning drivers of the dangerous condition of the roadway.

7.     The U.S. Forest Service owed a duty to Mr. Okert to ensure the roads were *maintained* in a safe manner.

*Id.* at 2 ¶¶ 6-7 (emphases added).

Plaintiff may not effectively amend his Complaint by raising a new theory of liability in opposition to a motion for summary judgment. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (citing *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)). The Court addresses the failure to maintain theory.

ORDER - 29

b.  Failure-to-Maintain Theory

Plaintiff contends that the Forest Service failed to maintain FSR 7320 as required by the policies set forth in the Forest Service Guidelines for Road Maintenance Levels ("Guidelines") regarding maintenance Level 3, FSM 7730, and FSH 7790.59.  *See* ECF No. 79 at 14-18.  It is true that the discretionary function exception would not apply where the allegedly negligent act was not a matter of employee discretion, but rather, the employee's refusal to comply with a mandatory policy.  *See Chang*, 139 F.4th at 1093.  For example, in *ARA Leisure Services v. United States*, the Ninth Circuit held that the discretionary function exception did not apply to the National Park Service's failure to maintain a road that had eroded down to roughly half of its original width and "had edges so soft as to be dangerous," where "Park Service standards explicitly required that park roads 'conform to the original grades and alignments' and that graded roads be 'firm, [and] of uniform cross section.'"  831 F.2d 193, 195 (9th Cir. 1987) (alteration in original).

But a reasonable fact finder could not conclude that the pothole Plaintiff struck stemmed from the Forest Service's refusal to comply with a mandatory policy, where the Forest Service's conduct was consistent with the requirements of the policies Plaintiff has identified.  It is undisputed that the Forest Service classified FSR 7320 as a Level 3 road.  ECF No. 83 at 3 ¶ 4 (citing ECF No. 29-

ORDER - 30

13).  It is undisputed that, under Forest Service policies, a Level 3 road's surface

often has potholes or washboarding and is intended to be used by "a prudent driver

in a standard passenger car" driving at low speeds.[11]  ECF No. 83 at 27-28 ¶ 55

(citing ECF No. 54 at 2-3 ¶ 6); *see also* ECF No. 29-14 at 27; ECF No. 32-2 at 27-

28.  It is further undisputed that the Forest Service had completed a Road

Management Objectives Report in 2007 that set forth specific management policies

for FSR 7320.  ECF No. 83 at 76 ¶ 72, 77 ¶ 73.  This Road Management

Objectives Report expressly provided that "[p]otholing and washboarding may

occur" on FSR 7320.  ECF No. 29-13 at 3.

Plaintiff also contends the Forest Service failed to implement FSM 7730 or

FSH 7790.59, which "repeatedly stress the importance of ensuring public safety on

open roads."  ECF No. 79 at 16.  FSM 7730 and FSH 7790.59 are entire chapters

of their respective publications, *see* ECF Nos. 55-12, 55-13, and Plaintiff does not

point to any specific policy contained in those chapters.  At best, he argues that

"FSM 7730 states plainly that maintenance activities must 'protect public safety'"

---

[11] In contrast, the Guidelines require that Level 4 roads be maintained to provide a

"moderate degree of user comfort and convenience for [a] standard passenger car,"

and that potholes, washboarding, and surface depressions be repaired for that

purpose.  ECF No. 29-14 at 19-26.

ORDER - 31

1    and "FSH 7790.59 instructs personnel to consider traffic types, user safety, and

2    roadway conditions when evaluating operational maintenance levels."  ECF No. 79

3    at 16.  The Court located only one instance in FSM 7730 of the phrase Plaintiff

4    quotes—"protect public safety"— in a section that concerns road use permits, not

5    road maintenance.  *See* ECF No. 55-12 at 18 ¶ 3.b.  Plaintiff's reference to FSH

6    7790.59 appears to be based on the section listing the factors the Forest Service

7    must consider as part of its road <u>classification</u> decision.  *See* ECF No. 55-13 at 5

8    § 62.31.  Plaintiff has not explained how the Forest Service allegedly failed to

9    maintain FSR 7320 as required by FSM 7730 or FSR 7790.59.  Instead, Plaintiff

10   appears to be invoking the Guidelines, FSM 7730, and FSH 7790.59 to argue that

11   the Forest Service should have classified FSR 7320 as a Level 4 road in the interest

12   of public safety.

13        There is another clear indication that Plaintiff's negligence claim is based on

14   the Forest Service's classification decision: his expert on roadway standards,

15   Mr. McNutt, stated in his report that FSR 7320 should have been classified at

16   Level 4 and failed to meet the Level 4 maintenance standards.  Mr. McNutt first

17   opines that, because the "[p]ictorial examples of Maintenance [L]evel 4 include . . .

18   asphalt surfaces," while those for Level 3 include "only gravel and native material

19   surfaces," FSR 7320 "requires maintenance at [L]evel 4" because it "is an asphalt

20

ORDER - 32

surface and is maintained as such."[12]  ECF No. 77-9 at 9.  For the rest of his report,

the only maintenance standard Mr. McNutt refers to is "Figure 10" of the

Guidelines—which contains one illustration of a Level 4 road.[13]  ECF No. 77-9 at

9-14; ECF No. 29-14 at 25 ("Figure 10").

In short, Plaintiff is substantively challenging the Forest Service's decision

to classify FSR 7320 as a Level 3 road, despite labelling that decision as a failure

to implement a mandatory policy.  The Court analyzes the classification decision

under the discretionary function exception's two-part test.

### 2.  *Application of the Two-Part Test*

It is Defendant's burden to demonstrate that the discretionary function

exception applies to its classification decision, *see Chang*, 139 F.4th at 1093,

although Plaintiff acknowledges that the exception "likely applies" to "[t]he

------

[12] He does not explain his assumption that Level 3 roads are categorically never

paved with asphalt.

[13] Mr. McNutt briefly mentions "the MUTCD."  *See* ECF No. 77-9 at 9, 11.  He

does not define this acronym in his report.  The Guidelines define it as the Manual

on Uniform Traffic Control Devices.  ECF No. 29-14 at 27.  No party has filed a

copy of the MUTCD on the record, but it appears to be a lengthy compilation of

policies published by the Federal Highway Administration.

ORDER - 33

1    USFS's road classification," ECF No. 79 at 16.  The Court assesses whether

2    Defendant has met its burden by establishing that its classification decision was (1)

3    discretionary and (2) based on considerations of public policy.

4         On the first step of the analysis, there is no genuine dispute that the Forest

5    Service's classification decision was a matter of discretion.  There is no statute,

6    regulation, or policy requiring the Forest Service to classify FSR 7320 as a Level

7    3.  *See Chang*, 139 F.4th at 1093.  The Guidelines (as well as FSH 7709.59

8    § 62.31) merely identify the factors that the Forest Service must consider when

9    selecting the maintenance level classification for a road and when contemplating

10    future changes to the road's current maintenance level.  *See* ECF No. 29-14 at 8-

11    10; ECF No. 55-13 at 5-6.

12         On the second step of the analysis, Defendant has demonstrated that the

13    Forest Service's classification decision involved considerations of public policy.

14    First, as mentioned above, Forest Service policies require that all classification

15    decisions involve a variety of policy considerations.  The Guidelines and FSH

16    7709.59 § 62.31 require that initial classification decisions be made after

17    considering the applicable road management objectives (which are, in turn, based

18    on considerations like resource management, access, environmental constraints,

19    etc.); protecting existing investments in the road; the road's service life and current

20    operational status; user safety; the volume, type, class, and composition of traffic;

ORDER - 34

1  the road's surface type; users' travel speed; user comfort and convenience; and the

2  road's functional classification.  ECF No. 29-14 at 9-10.  Changes to the

3  classification level similarly require consideration of "future road management

4  objectives, traffic needs, budget constraints, and environmental concerns."  *Id.* at

5  10.

6       Second, the record demonstrates that the Forest Service did, in fact, base its

7  classification decision for FSR 7320 on considerations of political, economic, and

8  social policies.  The 2007 Environmental Assessment reflects consideration of a

9  multitude of policy issues—e.g., wildfire mitigation; environmental concerns

10 relating to wildlife, plant life, and water and soil conditions; anticipated expenses

11 and offsets; preserving recreational features; preserving and improving the natural

12 forest aesthetics and scenery; protection of cultural resources (including "formal

13 government-to-government consultation with the Yakama Nation and the

14 Confederated Tribes of the Colville Reservation"); adverse impacts upon livestock

15 grazing permitholders; and necessary short-term and long-term adjustments to the

16 system of Forest Service roadways within the Okanogan-Wenatchee National

17 Forest (including FSR 7320).  *See, e.g.*, ECF No. 54-1 at 18-29, 51-52, 186-87,

18 192-93.

19      Thereafter, the Forest Service's continuing decision to maintain FSR 7320 at

20 Level 3 was also a matter of policy-based discretion.  The Guidelines specifically

ORDER - 35

provide that a road's current maintenance level is based on "today's needs, road condition, budget constraints, and environmental concerns," whereas planned future changes to a road's classification level should be made after "considering future road management objectives, traffic needs, budget constraints, and environmental concerns." ECF No. 29-14 at 10. Mr. Farmer attests in his declaration that reclassification of FSR 7320 as a Level 4 road would require the Forest Service to expend significant time, effort, and funding to conduct the necessary environmental impact assessment and reconstruct the 10-mile length of FSR 7320 to bring it into compliance with the Level 4 standard. ECF No. 54 at 3-5 ¶¶ 9-10. The 2007 Environmental Assessment, although concerning a larger area of the Okanogan-Wenatchee National Forest, provides some illustration of the breadth of the policy considerations a Level 4 upgrade would require. Though Plaintiff disputes "that the road would require that level of construction," he does not point to any evidence that controverts this. *See* ECF No. 83 at 30-32 ¶¶ 58-59. It is undisputed that the differences in the design and maintenance requirements for the Level 3 standard versus the Level 4 standard go beyond filling potholes. *See* ECF No. 29-14 at 19-34; ECF No. 83 at 3 ¶ 6, 34 ¶ 61.

Accordingly, Defendant has demonstrated that the Forest Service's decision to classify FSR 7320 as a maintenance Level 3 road is shielded by the

ORDER - 36

discretionary function exception,[14] and this independently demonstrates that the Court lacks subject matter jurisdiction over Plaintiff's claim.

## CONCLUSION

The Court grants summary judgment for the United States on the issue of recreational use immunity. As a result, Plaintiff's claim is not based on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

---

[14] Other district courts in this Circuit have reached the same conclusion. *See, e.g., Mattle v. United States*, No. CV 12-10157, 2013 WL 11328421, at *6-9 (C.D. Cal. Nov. 26, 2013) (finding the discretionary function exception applicable to the Forest Service's operation, management, inspection, and maintenance of a Level 2 road); *Ball v. United States*, No. C17-5056, 2018 WL 4095084, at *6-7 (W.D. Wash. Aug. 28, 2018) (finding the discretionary function exception applicable to the Forest Service's design construction, and maintenance of a Level 3 road); *Daniel v. United States*, No. 22-CV-5303, 2024 WL 1410634, at *12 (W.D. Wash. Apr. 2, 2024) (finding the discretionary function exception applicable to the Forest Service's design and maintenance-priority decisions for a Level 2 road, but not to the Forest Service's decision to declare the road "safe for haul" despite allegedly knowing that the road had a dangerously eroded shoulder).

ORDER - 37

occurred" and outside the scope of the FTCA's waiver of sovereign immunity. *See* 28 U.S.C. § 1346(b).

The Court also grants summary judgment for the United States on the discretionary function exception, which independently divests the Court of jurisdiction under the FTCA.

Absent subject matter jurisdiction to proceed in this matter, the Court dismisses the case.

Accordingly, **IT IS HEREBY ORDERED:**

1.     Defendant's Motion for Summary Judgment, **ECF No. 53**, is **GRANTED.**

2.     This matter is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

     a.  Defendant's Motion to Exclude Witness Testimony, **ECF No. 39**, is **DENIED AS MOOT**.

     b.  The bench trial set for **November 17, 2025**; the pretrial conference set for **October 28, 2025**, and all other dates and deadlines are **STRICKEN**.

**IT IS SO ORDERED.**  The District Court Executive is directed to file this Order, provide copies to the parties, **enter judgment of dismissal without prejudice, and CLOSE the file**.

ORDER - 38

DATED August 15, 2025.

*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER - 39